

1  Dominique R. Shelton (SBN 157759)
   Erin L. Pfaff (SBN 259349)
2  EDWARDS WILDMAN PALMER LLP
   9665 Wilshire Blvd., Suite 200
3  Beverly Hills, CA. 90212
   Telephone:  (310) 860-8705
4  Facsimile:   (310) 860-3800
   dshelton@edwardswildman.com
5  epfaff@edwardswildman.com
6  Attorneys for Plaintiff,
   SHAHROKH MIRESKANDARI
7

8                UNITED STATED DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10  SHAHROKH MIRESKANDARI          CASE NO.
11                                 CV12- 02943 MMM (FFMx)
         Plaintiff,
12                                 COMPLAINT FOR:
            v.                     (1) UNLAWFUL, UNFAIR AND
13                                     FRAUDULENT BUSINESS
14  DAILY MAIL; ASSOCIATED             PRACTICES IN VIOLATION OF
    NEWSPAPER LTD; NATIONAL            CAL. BUS; & PROF. CODE §
15  STUDENT CLEARING HOUSE;            17200;
    DAVID GARDNER and DOES 1-    (2) BREACH OF CONTRACT;
16  10, INCLUSIVE.                 (3) TORTIOUS INVASION OF
17                                     PRIVACY;
                                   (4) INVASION OF RIGHT TO
18       Defendants.                   PRIVACY IN VIOLATION OF
19                                     CAL. CONST., ART. I, SEC.I;
                                   (5) TORTIOUS INTERFERENCE
20                                     WITH CONTRACTS;
                                   (6) TORTIOUS INTERFERENCE
21                                     WITH PROSPECTIVE ECONOMIC
22                                     ADVANTAGE;
                                   (7) COMPUTER FRAUD AND ABUSE
23                                     ACT 18 U.S.C. § 1030;
                                   (8) CALIFORNIA COMPUTER CRIME
24                                     LAW. CAL. PENAL CODE § 502;
                                   (9) VIOLATION OF CALIFORNIA'S
25                                     INVASION OF PRIVACY ACT
26                                     CAL PENAL CODE§ 630; AND
                                   (10) DECLARATORY RELIEF
27
                                   DEMAND FOR JURY TRIAL
28

2199749                          1
                            COMPLAINT

Plaintiff DR. SHAHROKH MIRESKANDARI ("Plaintiff") alleges as follows:

## INTRODUCTION

1.     This action arises from and seeks to enjoin the unlawful and wrongful publication of confidential, educational records belonging to plaintiff on websites owned by the Associated Newspaper websites including but not limited to: www.dailymail.co.uk, www.mailonsunday.co.uk, www.thisislondon.co.uk, and www.metro.co.uk (collectively hereinafter referred to as the "Websites"), all of which are accessible to residents of California.  Plaintiff's education records are protected and prohibited from being published under privacy protection laws of the United States and California, including, but not limited to: the Federal Educational Privacy Rights Act, California's Constitutional Right of Privacy, California state law protections for tortious invasion of privacy and unfair, unlawful and fraudulent business practices act.

## THE PARTIES

2.     Plaintiff is an American citizen, who attended undergraduate and law school in California during the 1991 to 1997 time-period.  Plaintiff has spent the last six (6) months in California.

3.     Plaintiff is informed and believes, and thereon alleges, that Defendant Daily Mail, is a company based in the United Kingdom ("UK") that does business in California and operates the Websites that are accessible here, with its principal place of business located at Northcliffe House, 2 Derry Street, Kensington, London W8 5TT.

4.     Plaintiff is informed and believes, and thereon alleges, that Defendant ASSOCIATED NEWSPAPER LTD. ("ANL"), is a company based in the UK that does business in California and operates the Websites that are accessible here, with its principal place of business located at Northcliffe House, 2 Derry Street, Kensington, London W8 5TT.  On information and belief, ANL owns the Daily

1    Mail.

2        5.      Plaintiff is informed and believes, and thereon alleges, that Defendant

3    NATIONAL STUDENT CLEARINGHOUSE ("STUDENT

4    CLEARINGHOUSE"), is a Virginia based corporation, with its principal place of

5    business located at 2300 Dulles Station Blvd. Suite 300 Herndon, VA 20171

6        6.      On Information and belief, Defendant David Gardner is an individual

7    residing in Newport Beach, California who was engaged as an agent of the Daily

8    Mail and/or ANL in investigating Plaintiff's background and publishing private

9    facts about him.

10       7.      For purposes of this action, Daily Mail, ANL and David Gardner are

11   collectively referred to below as the "DAILY MAIL".

12       8.      The true names and capacities, whether individual, corporate,

13   associate, partnership, limited liability company, or otherwise, of Doe Defendants

14   1-10, are unknown to Plaintiff, who therefore sues said Defendants by such

15   fictitious names and will ask leave to amend this Complaint to show their true

16   names and capacities when the same have been ascertained.  Plaintiff alleges on

17   information and belief that each of the fictitiously-named Defendants are

18   responsible in some manner for the wrongful conduct herein alleged, and that such

19   wrongful conduct caused harm to Plaintiff.

20                       **JURISDICTION AND VENUE**

21       9.      The court has jurisdiction over these claims under 28 U.S.C. §1331 for

22   federal questions and 28 U.S.C. § 1332 because the parties are citizens of different

23   states and the amount in controversy exceeds the sum or value of $75,000.

24       10.     Venue is proper in this district under 28 U.S.C. §§ 1391(a) because a

25   substantial part of the events giving rise to the claim occurred in this District.  In

26   addition Defendants Daily Mail and the ANL operate the Websites accessible to

27   California residents.  Defendant STUDENT CLEARINGHOUSE also operates a

28   website accessible to California residents.

11.     Plaintiff has standing to bring this case under Article III of the United States Constitution as follows:

    a. Plaintiffs have standing by virtue of alleging concrete, tangible and non-speculative injuries in fact, arising from violations of Federal statutes and the California Constitution;

    b. The statutes and Constitutional provisions at issue herein create legal rights, the invasion of which creates standing;

    c. Plaintiff is within the zone of persons sought to be protected by these statutory and Constitutional provisions, and if Plaintiff cannot protect such interests and seek either remuneration or injunctive relief, he would have no mechanism available to hold Defendants accountable for such misconduct;

    d. Plaintiff has suffered harm and economic injury as a result of each Defendant's actions which have caused Plaintiff to lose his practice and suffer injuries as a result of Defendants' unlawful conduct.

    e. Plaintiff has suffered harm and economic injury as a result of Defendants' surreptitious collection of his private educational records;

    f. Plaintiff's personal educational records and data is property that was obtained by Defendants and persons working for Defendants that Plaintiffs did not know, and who did not have Plaintiff's permission to access such data in the absence of Plaintiff's knowledge or consent. Plaintiff's personal property data, educational records and/or personal data assets include but are not limited to information regarding his academic performance, grades, and institutions from which he did not earn degrees;

    g. Plaintiff has suffered harm and economic injury as a result of each Defendant's conduct which has imposed undisclosed data

1  transmittal costs on Plaintiff;

2      h. Defendant's conduct caused harm to the value and security of

3         Plaintiff's personal data, including his educational records.

4  **FACTUAL BACKGROUND**

5  **A.**     **The Daily Mail and ANL Are Embroiled in Many Wiretapping and**

6        **Unauthorized Investigation Scandals in the UK.**

7      12.     In the wake of the phone-hacking and other scandals dogging the

8  publishing industry in the UK, increased attention has focused globally on unethical

9  reporting and investigation practices.

10      13.     The Daily Mail is squarely in the eye of public attention in the UK as it

11  is has been accused of using unethical and illegal tactics to obtain access to

12  confidential and private information.

13      14.     Indeed, the Daily Mail is accused of being one of the main culprits and

14  perpetrators of unethical investigation and hacking techniques to access confidential

15  data without proper consent.

16      15.     The UK Prime Minister authorized the "Leveson Inquiry" to

17  investigate the alleged unethical and illegal tactics employed by certain media

18  outlets such as the Daily Mail and News of the World.  The Leveson Inquiry

19  official website (at http://www.levesoninquiry.org.uk/) states that: "The Prime

20  Minister announced a two-part inquiry investigating the role of the press and police

21  in the phone-hacking scandal, on 13 July 2011."

22      16.     Among other things, the Daily Mail has come under scrutiny in the

23  Leveson Inquiry and elsewhere for the following abuses:

24       •   Phone hacking

25       •   Illegal access to personal data

26       •   Racial and islamophobic harassment

27       •   Inequality of arms and appearance of judicial bias

28       •   Improperly conspiring with the Solicitors Regulation Authority

("SRA") to obtain confidential information.

**B.** **The DAILY MAIL Accessed Plaintiff's Educational Records In Violation of the STUDENT CLEARINGHOUSE Privacy Commitment and Terms of Use Without His Consent.**

17. The DAILY MAIL commenced an investigation of Plaintiff's educational records in or about 2008.

18. Plaintiff is informed and believes that the Daily Mail engaged Defendant Gardner, and potentially others, to make inquiries of the STUDENT CLEARINGHOUSE regarding Plaintiff's educational records without his consent. *See e.g.,* Exhibit "51."

19. The STUDENT CLEARINGHOUSE privacy terms on its website make clear that:

> The Clearinghouse has maintained the confidentiality and privacy of records covering more than 100 million students since its inception.

> We require certification from all verification requestors that the student or alumnus **has given permission for his/her academic information to be released.**

*See,* STUDENT CLEARINGHOUSE Privacy Commitment, Exhibit "49" (Emphasis added).

20. Plaintiff never provided consent for DAILY MAIL to access his records. Plaintiff also did not provide consent for STUDENT CLEARINGHOUSE to provide his educational records, including degree and attendance information, to the DAILY MAIL.

**C.** **Plaintiff Has Years of Educational and Vocational Training.**

21. Much of Plaintiff's undergraduate and legal studying occurred in Los Angeles County.

22. Plaintiff graduated from National University, *summa cum laude*, with a Bachelors degree in Business Administration in 1992. Plaintiff then obtained his

Juris Doctorate ("JD") from the American University of Hawaii ("AUH") in 1997, while he was working in Los Angeles.

23.    Plaintiff also worked as a law clerk/paralegal in two law offices while he was in school in California.

24.    Upon completion of his JD at AUH, Plaintiff decided to move to London.  Rather than start from scratch, he applied to the UK Law Society – the body governing attorney admissions to obtain credits for his educational and work experience in the United States.  His experience was approved by the UK Law Society in or about 1997 and in subsequent years thereafter.

25.    Plaintiff attended law school in London at the London Guildhall University law school, graduating in 1998.

26.    He completed vocational training requirements in one year, with the Tehrani & Co. Solicitors, while he undertook the Professional Skills Courses and Higher Rights of Audience courses as required by the rules of the Law Society.  Plaintiff was duly and properly admitted as a solicitor on July 3, 2000.

27.    He began his carrier, where he conducted his training – i.e., Tehrani & Co. Solicitors, later renamed as Dean & Dean Solicitors by Mr. Tehrani.  It was not long before he made partner in his law firm and became a celebrated attorney in London, representing clients with difficult problems such as race discrimination against private employers by 2007.

**D.    In 2007, Plaintiff Takes on Representation of Clients Who Asserted Discrimination Claims Under the UK Equality Laws Against Scotland Yard.**

28.    In 2007, Plaintiff took on the representation of many clients who alleged race discrimination claims against Scotland Yard (sometimes referred to herein as Scotland Yard or the "Met").  Specifically, Plaintiff began to represent Tarique Ghaffur, the Assistant Commissioner of the Met– the highest ranking Asian officer ever in the Met Police.  Plaintiff, representing Assistant Commissioner

1  Ghaffur, filed a race discrimination claim against Sir Ian Blair and the Met Police,
2  ultimately resulting in Sir Ian Blair's resignation.

3      29.    According to articles published by the Daily Mail, the Plaintiff's
4  representation of Commissioner Ghaffur received particular attention within the
5  Met given that Ghaffur's claim of discrimination was similar to others expressed in
6  a 1999 Parliamentary study (titled the MacPherson Report) where "institutional
7  racism" was deemed to be an issue to which Scotland Yard needed to pay attention.
8  *See e.g., How Met Commander Ali Dizaei's bosses limply played along as he*
9  *shamelessly played the race card...,* Mail Online (dated February 9, 2010), attached
10 as Exhibit "38" and incorporated herein by this reference.

11 **E.     In 2007, Plaintiff Also Begins To Focus Attention on the Solicitors**
12        **Regulation Authority Regarding Claims of Discriminatory Treatment.**

13      30.    In October 2007, Plaintiff launched a separate action against the SRA.
14 Specifically, Plaintiff filed – a £10 million race discrimination claim against the
15 SRA – as the body that overseas attorney discipline.  Plaintiff's complaint was
16 based on the grounds that there was alleged disparate and disproportionate
17 enforcement of the SRA rules against minority-owned law firms rather than white-
18 owned firms.

19      31.    On or about August 29, 2007, Plaintiff reached out to the Right
20 Honorable Keith Vaz MP, Chairman of the Home Select Committee (one of the
21 most powerful and influential positions in any government in the UK) regarding
22 race concerns pertaining to the SRA's enforcement as to his firm, and other Black
23 and Minority Ethnic ("BME") firms, as it pertained to alleged discriminatory
24 enforcement practices.

25      32.    On or about September 4, 2007, Keith Vaz wrote a letter to the chief
26 executive of the SRA, Anthony Townsend, asking Townsend for an explanation as
27 to the conduct of the SRA towards Dean & Dean and Plaintiff.  Townsend
28 attempted to deflect the concerns. Notwithstanding, Keith Vaz invited the SRA and

members of the minority ethnic legal community for a meeting at the House of Commons.  The SRA chief executive Mr. Townsend and SRA Chairman Peter Williams also attended, as well as members of the justice ministry for and on behalf of Jack Straw, the justice minister.  Thereafter, Lord Ousley was commissioned by the government to investigate the alleged discriminatory practices of the SRA and, in July 2008, he provided a report in which he wrote that the SRA's disproportionate investigations into BME lawyers' practices left the institution open to charges of "institutional racism."

F.   **Plaintiff's Civil Rights Activities Apparently Piqued the Ire of the DAILY MAIL.**

33.   Plaintiff's work as a private attorney representing race discrimination plaintiffs apparently generated the ire of the DAILY MAIL.  As set forth more fully in paragraphs 41-73 below, beginning in September 2008, and continuing through to the present, the DAILY MAIL published on its Websites—and continues to make available today on the Websites—vitriolic and sensationalist articles attacking Plaintiff personally by exposing confidential and private details regarding his academic performance, grades and other personal information.  The motivation for the DAILY MAIL's disclosures of Plaintiff's private facts appears to be Plaintiff's representation of claimants in race discrimination cases.  For example, the DAILY MAIL published the following articles:

    a. *These three spivs have brought us the morality of the souk*, Mail Online (September 23, 2008), in which they described Plaintiff as "the crooked brief who has launched a flotilla of vexatious law suits, including the outrageous million-pound punt for 'racial discrimination' being brought against the Old Bill by the over-promoted Tarique Ghaffur."

    b. In that same article, the DAILY MAIL wrote that: "What Vaz, Mireskandari and Dizaei [Plaintiff's then client] all have in

common is a shameless, ruthless ability to squeal 'racism' at every opportunity.  And such is the cowardice of the New Labour Establishment that they get away with it time and time again. They believe they are untouchable because of their ethnicity. And, up until now, they've been proven right."

34.   The DAILY MAIL's public disclosures of Plaintiff's private facts and claims that he was allegedly "dodgy" and his legal qualifications "bogus" based thereon (as described more fully in paragraphs 41 – 73 below), though shocking, were typical practices for the DAILY MAIL in reporting about discrimination claims.  In fact, the publication has a history of attacking claimants who initiate actions for race, gender or sexual orientation discrimination.

35.   For example, with regard to a sexual harassment claim made by a lesbian soldier who received a £200,000 settlement, the DAILY MAIL published an article titled *If a compensation cheque for £280,000 is humiliating, feel free to humiliate me any time you like* Mail Online (November 28, 2008) (attached as Exhibit "21") stating:

> Of course, Mr. Ghaffur [Plaintiff's former client] is not the only one who has been cashing in this week on the grotesque nonsense of our equality laws.   Only yesterday, we read about Lance Bombardier Kerry Fletcher, the lesbian soldier who picked up a cheque for nearly £200,000 (signed by the taxpayer, of course) after she was pestered for sex by her boss . . . . Now I can well understand how tiresome it must be to be propositioned by someone you don't fancy (though many of us might find it rather flattering).

The article concludes that:

> "Certainly, Sgt Brown deserved to be punished if he was making a nuisance of himself . . . . But she's meant to be a solider, for heaven's sake. Aren't soldiers supposed to be tough?"

36.   As set forth in paragraphs 41-73 below in greater detail, beginning in 2008, the DAILY MAIL began a concerted campaign of disclosing private and

intrusive facts about Plaintiff's legal qualifications, grades, test scores and educational trajectory which were confidential – based upon DAILY MAIL's unauthorized investigation into his studies which occurred to some degree in and/or from California.  For example, the DAILY MAIL began a four (4) year campaign of running articles that accused Plaintiff of having dodgy legal qualifications because he received is degree from the AUH, which was a law school authorized to do business when Plaintiff obtained his JD degree in 1997.  *See e.g., Daily Mail* articles attached as Exhibits "1"-"48" hereto.

37.    In addition to Plaintiff himself, the DAILY MAIL attacked other parties that attempted to assist Plaintiff.

38.    For example, apparently because Mr. Vaz wrote a letter in support of the SRA examining its practices to determine whether there was truth to Plaintiff's claims of discriminatory treatment of minority-owned law firms, the DAILY MAIL wrote, "Mr. Vaz could have to quit as chairman of the home affairs select committee if he is censured over his links with the controversial lawyer Dr. Shahrokh Mireskandari."  *See MP Keith VAZ faces sleaze probe into claims he tried to interfere in a court case*, Mail Online (October 2, 2008), attached hereto as Exhibit "14" and incorporated herein by this reference.

39.    The DAILY MAIL's attacks did not stop even after Mr. Vaz was investigated and cleared of any wrong-doing by Parliament.  *Angry MPs want Keith Vaz's scalp in row over his involvement with crooked lawyer*, Mail Online (March 17, 2009), attached hereto as Exhibit "29" and incorporated herein by this reference.

40.    After paragraphs and days of published innuendo, embedded towards the end of one article, the DAILY MAIL finally reluctantly recognized that "Mr. Vaz is likely to escape a full-scale sleaze inquiry **because he has already been cleared of wrongdoing over his links to Plaintiff by Parliamentary Standards Commissioner** John Lyon."  *See Keith Vaz and the damning letter: How senior*

*Labour MP 'abused his position' to help crooked lawyer in court*, Mail Online (March 16, 2009, emphasis added), attached hereto as Exhibit "28" and incorporated herein by this reference.  The DAILY MAIL also conceded that "[m]ost of the charges against Mr. Vaz [leveled by the DAILY MAIL] were unproven..." *Id.*, p. 10.

## PRIVACY VIOLATIONS

A.   <u>**The DAILY MAIL published Plaintiff's Test scores and other Academic and Enrollment Records in Institutions That were not Previously Publicized.**</u>

41.   Beginning in 2008, the DAILY MAIL began a concerted campaign of disclosing private and intrusive facts about Plaintiff's academic performance, starting from high school and continuing through his postgraduate studies.

42.   For example, the DAILY MAIL wrote: "Having **failed** most if not all of his O-levels, he moved to London.  Friends remember that he flunked his exams again." *Liar, crook and friend of billionaires and royalty...meet the lawyer who's tearing the Met apart*, Daily Mail (September 11, 2008) (emphasis added), attached hereto as Exhibit "1" and incorporated herein by this reference.

43.   In a November 27, 2008 public filing, the DAILY MAIL stated that, "In the next few years he [Plaintiff] also attended law school for one semester at either Southwestern College or the University of San Fernando. He achieved **very low grades** and was expelled."  Daily Mail's Defence [to Plaintiff's defamation action pending in the UK] at Paragraph 6.21 (emphasis added).

44.   The DAILY MAIL repeated these claims in an article published online and accessible from the United States stating: "But the Law Society has discovered that Mireskandari was studying at two other universities, including the Whittier law school in California.  Mireskandari claims he left because he did not enjoy the course, 'but in fact he was academically disqualified by the university,' said the QC." *Disgraced race lawyer 'stole' thousands of pounds from clients to save his*

*business*, Mail Online (July 27, 2009), attached hereto as Exhibit "35" and incorporated herein by this reference. In addition to revealing his private educational records, the article makes no mention of Plaintiff's graduation *summa cum laude* from National University, or the fact that *after* obtaining his JD in the United States at the AUH, he went on to complete  law school in the UK at the London Guildhall University law school. (Also, despite the title of this particular DAILY MAIL article accusing Plaintiff of stealing "thousands of pounds" from clients, in April 2011, no wrong-doing was actually found. To the contrary, during the Solicitor Disciplinary Tribunal ("SDT") of Plaintiff, Mr. David Shaw—the SRA's forensic accounting expert who was responsible for going through Dean & Dean's accounts—provided a 1500-page report, which acknowledged that **not a single penny** was missing from Dean & Dean's accounts. This was true despite hundreds of millions of pounds going through the Dean & Dean accounts every year).

45.     In another article published on April 1, 2011, the DAILY MAIL repeated reference to Plaintiff's private test scores. Quoting the SRA's counsel, the DAILY MAIL reported: "It is our case that the doctorate is not the result of academic achievement but is a very doubtful qualification. We know the **marks of Dr. Mireskandari were low before the American University of Hawaii**. He had **flunked out of two universities** before he got to the American University of Hawaii.  There he was transformed from a very poor law student to a very promising student getting almost 100 percent marks." *Crooked race lawyer invented claims to stop his firm's financial problems being exposed*,' Mail Online (April 1, 2011) (emphasis added), attached hereto as Exhibit "47" and incorporated by reference herein.

46.     The UK Law Society does not publish on its website or elsewhere the law schools or undergraduate institutions where UK solicitors get their degrees – much less institutions where solicitors pursue studies for brief  periods of time (e.g.,

1  summer schools or transfer institutions) where no degrees are obtained.  Plaintiff

2  also did not do this for his personal educational records.  As set forth above, the UK

3  Law Society had already approved of Plaintiff's academic credentials from the US

4  in 1998.  Nevertheless, merely because Plaintiff had attended two other law

5  schools—which were not matters of public knowledge because he did not get

6  degrees from them—  the DAILY MAIL publicized the SRA's position that "We

7  will say that Plaintiff did not deserve to be called Dr. Mireskandari based on

8  genuine academic achievement."  *See* Exhibit "47," p. 3.

9          47.    In yet another article, published in 2009, the DAILY MAIL continued

10  its pattern of disclosing Plaintiff's academic record from schools where he neither

11  received, nor claimed to receive, his Juris Doctorate. For example, the DAILY

12  MAIL wrote: "But the Law Society has discovered that Mireskandari was studying

13  at two other universities, including the Whittier law school in California.

14  Mireskandari claims he left because he did not enjoy the course, 'but in fact he was

15  academically disqualified by the university,' said the QC." *Disgraced race lawyer*

16  *'stole' thousands of pounds from clients to save his business*, Mail Online (July 27,

17  2009), attached hereto as Exhibit "35" and incorporated by reference herein.

18          48.    The DAILY MAIL also conducted interviews of Plaintiff's former

19  employers in California and attorneys who represented him (who seemingly

20  breached the attorney client privilege by exposing confidential communications)

21  and quoted their unattributed statements such as the following: ". . . Sean started a

22  law course at a minor local university. . . . Unfortunately he failed his exams

23  miserably at the end of his first semester. He failed his retakes and that was that."

24  *See* Exhibit "1," p. 6.

25  **B.**    **The Law Schools Plaintiff Attended Were Not Public Facts.**

26          49.    As set forth above, the Law Society does not publish UK solicitor's

27  law school information.  This is confidential.  Similarly, Plaintiff's firm did not

28  publicize all of the schools he attended.  Therefore, the various universities he

1   attended – where degrees were not obtained were not readily accessible or known to
2   the public.

3        50.    Plaintiff himself reinforced the confidential nature of educational
4   records to the DAILY MAIL. As the DAILY MAIL acknowledged "When asked
5   where he went to law", the DAILY MAIL acknowledged that Plaintiff replied "I
6   am of no public interest." *Lawyer at centre of Scotland Yard race war is convicted*
7   *conman with suspect legal qualifications*, Daily Mail (September 11, 2008),
8   attached hereto as Exhibit "2" and incorporated by reference herein.

9        51.    Further, "When initially approached by us [Daily Mail], Mireskandari
10  refused to reveal the origin of his basic law degree." *Keith Vaz and the damning*
11  *letter: How senior Labour MP 'abused his position' to help crooked lawyer in*
12  *court*, Mail Online (March 16, 2009), attached hereto as Exhibit "28" and
13  incorporated herein by reference; and *Keith Vaz, the freebie tickets and the truth*
14  *about that letter to a judge in the High Court* (March 16, 2009), attached hereto as
15  Exhibit "24" and incorporated herein by reference. *See also*, Exhibit "2,"*supra*, p.
16  2.

17       52.    Quoting unnamed "senior attorneys" at a "law firm which employed"
18  Plaintiff in California, the DAILY MAIL reported: "His main academic credential
19  was a bachelor's degree from the University of Pennsylvania (the University has no
20  record of it)." *See* Exhibit "1."

21       53.    In addition, the DAILY MAIL published articles that directly
22  discussed Plaintiff's academic performance, which is protected under the Family
23  Educational Rights and Privacy Act ("FERPA") from disclosure.  For example, in
24  the article titled *Disgraced race lawyer 'stole' thousands of pounds from clients to*
25  *save his business,* the DAILY MAIL published the following: In addition to AUH
26  where he received his degree, ". . . the Law Society has discovered that
27  Mireskandari was studying at two other universities, including the Whittier law
28  school in California.  Mireskandari claims he left because he did not enjoy the

court, 'but in fact he was academically disqualified by the university,' said the QC."
*See* Exhibit "35," p. 2.

54.   The DAILY MAIL also published facts about the AUH—which ultimately lost its license to operate in 2005 almost **ten years** *after* Plaintiff was a student there—that revealed Plaintiff's academic record and attendance.

55.   For example, in an article dated September 12, 2008, the DAILY MAIL published the following statement about Plaintiff: "He is also being investigated by the Solicitors Regulation Authority (SRA) over his qualifications. The inquiry is focused on a law degree from a 'university' in Hawaii – simply a small office used as a mailing address – that has since been closed down by the U.S. authorities." *The crooked lawyer and his 'very good friend' police chief who told him how to tear a case apart,* Daily Mail (September 12, 2008), attached hereto as Exhibit "3" and incorporated by reference herein.  The article does not mention that the UK Law Society expressly accepted and approved of Plaintiff's studies in the United States back in 1998 when he first applied to undertake legal studies in London.

56.   Also, in Exhibit "28," *supra*, the DAILY MAIL published about Plaintiff that:  "[H]is long list of qualifications which seemingly underpinned his boast of being 'the best lawyer in the world' were in fact based on awards given to him by a 'degree-mill' which operated out of two rooms in Hawaii. It has since been closed down by the U.S. authorities."  *See* Exhibit "28," p. 7.

57.   Further in the article numbered Exhibit "35," *supra*, the DAILY MAIL states: "He claims he is doctor of jurisprudence after scoring top grades in masters and PhD courses at the **discredited** American University of Hawaii in the mid-1990s." *See* Exhibit "35," p. 2 (emphasis added).

58.   In yet another article, titled *Britain's most senior Asian police officer set to win £300,000 deal to end racism claim,* Mail Online (November 5, 2008), attached hereto as Exhibit "17" and incorporated by reference herein, the DAILY

MAIL states, "Dr. Shahrokh Mireskandari . . . obtained his law degree from a discredited 'mail drop' university in Hawaii."  As set forth above, the Plaintiff's US law school attendance was not public information.  And, as discussed above, he completed an additional law degree in London in 1998.

59.    Also, in an article titled *Crooked race lawyer 'invented claims to stop his firm's financial problems being exposed,*' Exhibit "47," *supra*, the DAILY MAIL wrote: "But a Solicitors Disciplinary Tribunal hearing was told the solicitor, who also represented former Met Assistant Commissioner Tarique Ghaffur in his bungled race claim against the force in 2008, has a **dodgy** doctorate from the American University of Hawaii, which has since been closed down by the US authorities." (Emphasis added).  This article's misrepresentation of Mr. Ghaffur's race discrimination claim as "bungled" is belied by the DAILY MAIL's concession that Mr. Ghaffur's settlement with the Met "mean[t] he will walk away from policing with close to £1 million."  Exhibit "17," *supra*, p.1.  As such, Mr. Ghaffur's settlement represented the bulk of his demand wherein, as the DAILY MAIL reported, he "originally claim[ed] £1.2 million from Scotland Yard."  *Id.*, p.1.

C.    **The Daily  Mail Publicized the Terms Upon Which Plaintiff Purportedly Obtained His Degrees —Without His Consent—and Based Upon his Confidential Academic Records.**

60.    In an unauthorized article titled, *The officer who is a disgrace to his uniform*, Daily Mail (September 12, 2008), attached hereto as Exhibit "5" and incorporated by reference herein, the Daily Mail states: ". . . the Mail this week exposed Plaintiff as a . . . fraudster with a suspect legal degree . . . ."  *See also Ian Blair and the REAL victims of anarchy at the Yard*, Daily Mail (September 13, 2008) ("Why, he's none other than Shahrokh Mireskandari, who, as the Mail revealed this week… has decidedly dodgy legal qualifications."), attached hereto as Exhibit "6" and incorporated by reference herein.

61.   In yet another article titled, *Sleaze watchdog to probe links between Keith Vaz and fraudster*, Mail Online (September 22, 2008), attached hereto as Exhibit "10" and incorporated by reference herein, the DAILY MAIL reported that "Earlier this month, following a major Daily Mail investigation, we revealed that Mireskandari is a ... fraudster with **suspect** legal qualifications." (Emphasis added.)

62.   In an article first published on October 3, 2008, the DAILY MAIL continued its attack against Plaintiff: "Last month Blair put Ghaffur [Plaintiff's client] on gardening leave following inflammatory statements by lawyer Sean Mireskandari, whom the Mail has exposed as having ...**dubious** legal qualifications." *Arrogance, lies and the downfall of very PC police Chief*, Mail Online (October 3, 2008), attached hereto as Exhibit "15" and incorporated by reference herein.

63.   Then again on November 5, 2008 the DAILY MAIL reported: "In September, Mr. Ghaffur suffered huge embarrassment after the Daily Mail revealed that his lawyer is a crook with **suspect** legal qualifications. *Britain's most senior Asian police officer set to win £300,000 deal to end racism claim*, Mail Online (November 5, 2008), emphasis added, attached hereto as Exhibit "17" and incorporated by reference herein.

64.   And on November 10, 2008 the DAILY MAIL wrote: "Shahrokh Mireskandari may face professional ruin following a probe into his qualifications...he has been uncharacteristically quiet since the Daily Mail revealed two months ago that he is a . . . conman who has dubious legal qualifications." *Watchdog ready to close down crooked lawyer in Yard race war*, Mail Online (November 10, 2008), attached hereto as Exhibit "18" and incorporated by reference herein.

65.   Similarly, in an article titled *Top Asian policeman Tarique Ghaffur who triggered Met race war walks away with £280,000 out-of-court settlement*, Mail Online (November 25, 2008), attached hereto as Exhibit "20" and

incorporated by reference herein, the DAILY MAIL wrote: "Britain's top Asian policeman has been left humiliated after agreeing [sic] a £280,000 out-of-court settlement over his controversial race claims . . . The climb down came after the Daily Mail exposed Mr. Ghaffur's solicitor Shahrokh Mireskandari as a . . . crook with dubious legal qualifications." Again, in addition to wrongfully publicizing Plaintiff's confidential educational record, the article mischaracterizes the actual settlement Mr. Ghaffur obtained which the DAILY MAIL concedes was £1 million, and his original demand was substantially the same at £1.2 million. Exhibit "17," *supra*.

66.   In yet a further article published on November 28, 2008, the DAILY MAIL states: "To recap: Assistant Commissioner Ghaffur is the officer who tried to extort £1.2 million from the Met by claiming, with the help of a crooked lawyer, that he was a victim of racism." *If a compensation cheque for £280,000 is humiliating, feel free to humiliate me any time you like*, Mail Online (November 28, 2008), attached hereto as Exhibit "21" and incorporated by reference herein. In that same article, the DAILY MAIL concedes that Plaintiff's educational record in the United States was confidential, not public: "All right, he [Mr. Ghaffur, Plaintiff's client] may not have known that his solicitor, Shahrokh Mireskandari had . . .a dodgy doctorate from a Hawaiian university, which has since been shut down by an American court, but he surely knew his racism claim was utterly preposterous. Anyone with an ounce of common sense could have told him that." *Id.*

67.   In at least two other articles, the DAILY MAIL referred to Plaintiff as "a . . . conman with bogus legal qualifications." *See, e.g.,  Keith Vaz, the freebie tickets and the truth about that letter to a judge in the High Court*, Daily Mail (March 16, 2009), attached hereto as Exhibit "25" and incorporated by reference herein; *A shameless abuse of power and office*, Daily Mail Comment (March 16, 2009), attached hereto as Exhibit "27" and incorporated by reference herein.

68.   In another article titled *Analysis : A toothless watchdog too craven to*

1      *bark*, Mail Online (March 31, 2009), attached hereto as Exhibit "30" and

2      incorporated by reference herein, the DAILY MAIL wrote: "Mireskandari had a

3      conviction for fraud and his legal qualifications did not bear scrutiny."

4           69.    In yet another article dated April 22, 2009, the DAILY MAIL boasts,

5      "Only last month, the Mail exposed how [Vaz] abused his chairmanship of the

6      Home Affairs committee by attempting to influence the High Court on behalf of his

7      crooked lawyer friend, Sean Mireskandari." *Action at last on MP's expenses*, Mail

8      Online (April 22, 2009), attached hereto as Exhibit "33" and incorporated by

9      reference herein.

10     70.    Then, on February 9, 2010, the DAILY MAIL reiterates yet again that

11     Plaintiff has "bogus legal qualifications." *How Met Commander Ali Dizaei's*

12     *bosses limply played along as he shamelessly played the race card*, Mail Online

13     (Feb. 9, 2010), attached hereto as Exhibit "38" and incorporated by reference

14     herein. *See also A criminal in uniform: Teflon Commander Ali Dizaei used race*

15     *card to dodge jail for years. Now he's got four-year term for framing an innocent*

16     *man*, Mail Online (February 9, 2010) (referencing Plaintiff's alleged "bogus legal

17     qualifications"), attached hereto as Exhibit "39" and incorporated by reference

18     herein; *Disgraced, jailed and now sacked…shamed police commander Ali Dizaei*

19     *faces ruin*, Mail Online (April 1 2010) (mischaracterizing Plaintiff as "bogus race

20     lawyer Shahrokh Mireskandari"), attached hereto as Exhibit "41" and incorporated

21     by reference herein.

22     71.    In another article titled *Truth about Keith Vaz and crooked lawyer:*

23     *Sleaze scandal as Labour MP tries to take charge of crucial committee*, Mail

24     Online (June 8, 2010), attached hereto as Exhibit "43" and incorporated by

25     reference herein, the DAILY MAIL refers to Plaintiff has having: "bogus legal

26     qualifications," and as being a "bent" lawyer. Nevertheless, the article concedes

27     that Plaintiff was presented with the Asian Lawyer of the Year award.

28     72.    In Exhibit "47," *supra*, the DAILY MAIL also wrote: "It is alleged

1    Mireskandari based his legal career on **bogus** qualifications while charging clients

2    hundreds of thousands of pounds for unsound legal advice during his time at Dean

3    and Dean." (Emphasis added).

4         73.    Finally, in an article titled *Back to jail for disgraceful Dizaei: Yard's*

5    *'Teflon commander' found guilty of corruption for a second time*, Mail Online

6    (February 15,2012), attached hereto as Exhibit "48" and incorporated by reference

7    herein, the DAILY MAIL again refers to Plaintiff as having "bogus legal

8    qualifications."

9    **THE DAILY MAIL TAKES CREDIT FOR CAUSING INVESTIGATION OF**

10   **PLAINTIFF'S PRACTICE, SUSPENDING HIS PRACTICING**

11   **CERTIFICATE AND SHUTTING DOWN HIS LAW FIRM**

12   A.    **The DAILY MAIL Conducts Its Own Investigation**

13        74.    The DAILY MAIL admits that it began an investigation centered on

14   the Plaintiff's qualifications and study, which took place in large part in California.

15   *See* Exhibit "1." Further, the DAILY MAIL admits that "Following a Daily Mail

16   investigation, the damning truth about Sean Mireskandari can be revealed." *Id.*

17   B.    **DAILY MAIL Takes Credit For SRA's Investigation**

18        75.    In an article titled *Lawyer at centre of Scotland Yard race war is*

19   *convicted conman with suspect legal qualifications*, Daily Mail (September 11,

20   2008), Exhibit "2," *supra*, the DAILY MAIL brags that: "The Mail can reveal that

21   Mireskandari . . . [i]s being investigated by the Solicitors' Regulation Authority

22   after doubts were raised over his legal qualifications."

23        76.    Then, in the article titled *Crooked race lawyer 'invented claims to stop*

24   *his firm's financial problems being exposed*, Exhibit "47," *supra*, the DAILY

25   MAIL asserts triumphantly that: "The SRA took action against Mireskandari **after**

26   **he was exposed by the Mail in September 2008 as a . . . conman with bogus**

27   **qualifications**, who had also lied about his past to become a solicitor in England.

28   At the time Plaintiff was a pivotal figure in a 'race war' engulfing senior ethnic

1    minority officers at Scotland Yard." (Emphasis added).

2    **C.**     **DAILY MAIL Takes Credit For SRA's Suspension Of Plaintiff's**

3            **License**

4            77.    The DAILY MAIL further boasts that "Shahrokh Mireskandari was

5    barred from the legal profession following exposure by the Daily Mail as a . . .

6    conman with dubious legal qualifications." *Bent Lawyer in Met police 'race war is*

7    *facing ruin*,' Mail Online (December 17, 2008), attached hereto as Exhibit "22" and

8    incorporated by reference herein.

9            78.    In other articles, the DAILY MAIL takes credit for harming Plaintiff

10   as follows:

11           79.    ". . . Shahrokh 'Sean' Mireskandari who following revelations in this

12   newspaper last year that he had convictions in the US and bogus legal

13   qualifications, has been suspended from practicing law in Britain." *See* Exhibit

14   "28."

15           80.    In *Disgraced, jailed and now sacked…shamed police commander Ali*

16   *Dizaei faces ruin*, Exhibit "41," *supra*, the DAILY MAIL acknowledges that

17   "Following the Mail's revelations . . . Mireskandari has been suspended by the

18   Solicitors Regulation Authority for alleged dishonesty and his firm closed down."

19           81.    In yet another article, the DAILY MAIL reports that: "Dizaei's close

20   friend and former lawyer Shahrokh Mireskandari – who was exposed by the Daily

21   Mail as a . . . conman with bogus legal qualifications – has been suspended by the

22   Solicitors Regulation Authority for alleged dishonesty and his London firm Dean

23   and Dean closed down." *Shamed police chief Ali Dizaei loses bid to appeal against*

24   *his four –year jail term*, Mail Online (June 22, 2010), attached hereto as Exhibit

25   "45" and incorporated herein by reference.

26           82.    "As a result of our revelations, Mireskandari's West End law firm is

27   shut down and he is suspended from the legal profession." *Back to jail for*

28   *disgraceful Dizaei: Yard's 'Teflon commander' found guilty of corruption for a*

*second time*, Mail Online (February 15, 2012), attached hereto as Exhibit "48" and incorporated herein by reference.

**D.     DAILY MAIL Takes Credit For Interrupting Plaintiff's Representation Of Individual Plaintiffs In Race Discrimination Claims Against Scotland Yard – Including Tarique Ghaffur**

83.     "Until our revelations, Dean & Dean Solicitors represented Met Assistant Commissioner Tarique Ghaffur, Met Commander Ali Dizaei and the National Black Police Association." *Law firm in race row with links to Labour's Keith Vaz Is closed by watchdog*, Mail Online (January 2, 2009), attached hereto as Exhibit "23" and incorporated herein by reference.

**E.     Daily Mail Takes Credit For Shutting Down Plaintiff's Law firm Dean & Dean**

84.     As set forth above, prior to the DAILY MAIL's articles and investigations, Dean & Dean, Plaintiff's firm was a thriving enterprise.  Defendants knowingly interrupted this.  For example, the Daily Mail admitted that:  "The law firm at the centre of Scotland Yard's race war has been closed down by a watchdog following a damning Daily Mail investigation, it has been revealed."  Exhibit "23," *supra*.

**FIRST CAUSE OF ACTION**

**UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES**

**(VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *et seq.*)**

**(Against All Defendants)**

85.     Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

86.     Beginning at an exact date unknown to Plaintiff but at least since September 2007, Defendants have committed acts of unfair competition, as defined by Cal. Bus. & Prof. Code §17200, by engaging in the following unfair, unlawful

1   and fraudulent business practices: (i) misrepresenting their identity and/or authority

2   in order to obtain private information about the Plaintiff; (ii) violating the Privacy

3   Commitment set forth on the STUDENT CLEARINGHOUSE website, and

4   attached hereto as Exhibit "49," in obtaining and/or disclosing Plaintiff's academic

5   records; (iii) violating the Terms and Conditions of Use set forth on the STUDENT

6   CLEARINGHOUSE website, and attached hereto as Exhibit "50," in obtaining

7   and/or disclosing Plaintiff's academic records; and (iv) publicly disclosing and

8   publishing private facts about Plaintiff's academic and educational background in

9   numerous articles appearing in *The Daily Mail*, *The Mail Online*, and on the

10   Websites, among other places.

11        87.    These acts and practices, as described in the preceding paragraphs,

12   violate Cal. Bus. & Prof. Code §17200 in the ways described above and the

13   additional following respects, among others:

14        88.    **Unlawful Conduct** Defendants' access, disclosure, use, publication

15   and dissemination of Plaintiff's private academic and educational records

16   constitutes a violation of California state privacy rights and laws, as well as a

17   breach of STUDENT CLEARINGHOUSE's express Privacy Commitment and

18   Terms & Conditions of Use.  In addition, Plaintiff is informed and believes that

19   DAILY MAIL may have also contacted the STUDENT CLEARINGHOUSE to

20   obtain his educational records in violation of FERPA.

21        89.    **Unfair Conduct**. Defendants' access, disclosure, use, publication

22   and dissemination of Plaintiff's private academic and educational records

23   constitutes unfair business acts or practices within the meaning of Cal. Bus. & Prof.

24   Code §17200.  The harm to Plaintiff clearly outweighs the utility of Defendants'

25   practices, which have directly resulted in irreparable harm to Plaintiff's legal career.

26   In addition, the harm caused to Plaintiff is an anti-trust like injury in that it harmed

27   Plaintiff's business and client relationships.  Plaintiff was unable to compete for

28   business and clients as his law practice was shut down and license to practice law

1   suspended due to Defendants' activities, thereby creating advantages for other firms

2   who were able to take over representation of clients that the Plaintiff previously

3   represented.

4   90.   **Fraudulent Conduct**. Defendant STUDENT CLEARINGHOUSE's

5   practice of advertising and representing that it only releases academic and

6   educational records, including the verification of enrollment and degrees, to

7   individuals or entities who have obtained the student's consent and/or authorization

8   is likely to deceive, and has deceived, Plaintiff and, consequently, constitutes a

9   fraudulent business act or practice within the meaning of Cal. Bus. & Prof. Code

10  §17200. Defendant DAILY MAIL's practice of misrepresenting that it had

11  obtained Plaintiff's consent, as well as the purpose for its request(s) to the

12  STUDENT CLEARINGHOUSE, in order to obtain Plaintiff's private academic and

13  educational records is likely to deceive, and has deceived, Plaintiff and,

14  consequently, constitutes a fraudulent business act or practice within the meaning

15  of Cal. Bus. & Prof. Code §17200. Defendants' conduct was intentional in that

16  they knowingly violated Plaintiff's privacy rights in order to produce inflammatory

17  articles that they published.

18  91.   The unlawful, unfair, and/or fraudulent business practices of

19  Defendants, as described above, have harmed, and continue to harm, Plaintiff's

20  reputation, professional career and business relationships, including his clients'

21  confidence in his academic and professional credentials, and have ultimately

22  rendered it impossible for Plaintiff to engage in the practice of law, among other

23  harms.

24  92.   As a direct and proximate cause of Defendants' conduct as set forth

25  herein, Plaintiff has suffered injury in fact and has lost income and/or property as a

26  result of the unlawful, unfair, and fraudulent business practices of Defendants, as

27  set forth above. Further, Defendants have profited from the unauthorized access

28  and disclosure of Plaintiff's private academic and educational records in violation

1    of Plaintiff's legally protected interests.

2        93.    California's Unfair Competition Law ("UCL") permits civil recovery

3    and injunctive relief for "any unlawful, unfair or fraudulent business act or

4    practice," including if a practice or act violates or is considered unlawful under any

5    other State, Federal or foreign law.  For the reasons set forth above, Defendants

6    have violated the UCL.

7        94.    Plaintiff hereby seeks to enjoin Defendants, and each of them, and

8    their agents and employees, from accessing, disclosing, using, publishing and/or

9    disseminating Plaintiff's private academic and educational records, and from

10   otherwise engaging in the unlawful, unfair, and fraudulent business practices, as

11   alleged herein, in the future.  There is not an adequate remedy at law.  If an

12   injunction is not ordered, Plaintiff will continue to suffer harm for which there will

13   be no adequate remedy at law to prevent.

14       95.    Plaintiff additionally seeks restitution as may be necessary to restore to

15   them any money or property which may have been acquired by Defendants by

16   means of such unlawful, unfair, and fraudulent business practices.

17       96.    Plaintiff additionally seeks attorneys fees pursuant to equitable

18   doctrines and California Code of Civil Procedure §1021.5, costs of suit, and for

19   such further relief as the Court may deem just and proper.

20                      **SECOND CAUSE OF ACTION**

21                      **BREACH OF CONTRACT**

22                      **(Against All Defendants)**

23       97.    Plaintiff repeats, realleges, adopts and incorporates each and every

24   allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth

25   herein.

26       98.    Plaintiff is informed and believes, and thereon alleges, that the

27   STUDENT CLEARINGHOUSE website states in both its Privacy Commitment

28   (*see* Exhibit "49") and Terms & Conditions of Use (*see* Exhibit "50") that it will

not disclose any information about a student's academic and educational records without "certification … student or alumnus has given permission for his/her academic information to be released." The STUDENT CLEARINGHOUSE further provides that any information lawfully released to a requestor shall not be "re-released to any third parties." The STUDENT CLEARINGHOUSE privacy policy and terms of use constitute an implied contract with any user of the website, including, in this case, the DAILY MAIL Defendants.

99.   Because the substance of the contract explicitly relates to private student information, Plaintiff is a third-party beneficiary of the contract between STUDENT CLEARINGHOUSE and the DAILY MAIL. Accordingly, Defendants had an implied-in-law contract with Plaintiff to protect his confidential educational records stored in trust by the STUDENT CLEARINGHOUSE, with the understanding that no records would be disclosed without an alumnus' consent as set forth expressly in STUDENT CLEARINGHOUSE's Privacy Commitment. (Exhibit "49.")

100.   STUDENT CLEARINGHOUSE breached the contract when it released Plaintiff's academic and educational records to the DAILY MAIL without Plaintiff's authorization.

101.   The DAILY MAIL was in breach of its agreement with STUDENT CLEARINGHOUSE when it (a) represented that it had Plaintiff's consent to obtain his academic and educational records, (b) represented that it had valid reason for its request for such information, in accordance with the STUDENT CLEARINGHOUSE's express Privacy Commitment statement and Terms & Conditions of Use as set forth on its website, and (c) publicly disclosed information obtained in Plaintiff's academic and educational records in a series of news articles that were, and are, available on the Internet – as recently as April 2, 2012.

102.   Plaintiff has been harmed in an amount of damages to be determined according to proof at trial, but which exceeds this Court's jurisdictional minimum.

### THIRD CAUSE OF ACTION

### TORTIOUS INVASION OF PRIVACY

### (Against DAILY MAIL)

103.   Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

104.   Defendants, without authorization, publicly disclosed in a series of news articles, private facts about Plaintiff's educational background, including the institutions where he studied, his test and examination scores while there, the years of academic attendance, as well as other overall confidential academic performance details, which Defendants unlawfully obtained.

105.   The disclosure of such private facts, many of which were mischaracterized and/or untrue, suggested that Plaintiff was not qualified to practice law and had lied about his experience and credentials, which has caused undue harm to Plaintiff's reputation and career.  Accordingly, such disclosure is offensive and objectionable to the reasonable person.

106.   Plaintiff is a private person, and his academic and educational records are not of legitimate public concern.

107.   As a direct and proximate result of Defendants' intrusion, Plaintiff has suffered stress, anxiety and general mental anguish related to the publication of such private facts and the related harm to his reputation and career.

108.   There are no competing or countervailing interests that outweigh the privacy interests at stake.  Accordingly, Plaintiff seeks declaratory and injunctive relief to prevent Defendants from continuing to obtain, use, disclose and/or disseminate Plaintiff's academic and educational records.  Plaintiff has been further damaged in an amount to be determined at trial.

/ / /

/ / /

COMPLAINT

### FOURTH CAUSE OF ACTION

### INVASION OF RIGHT TO PRIVACY

### (CALIFORNIA CONSTITUTION, ART. SEC. I)

#### (Against DAILY MAIL)

109. Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

110. Defendants obtained, used, disclosed, published and disseminated Plaintiff's private academic and educational records, over a substantial period of time, without his knowledge or consent, and in violation of Plaintiff's clear intent to withhold such information from the public domain. Indeed, where and when Plaintiff was enrolled in undergraduate, graduate and post-graduate coursework was not information that was ever disclosed on his law firm website, The Law Society website, or otherwise made publicly available. Moreover, whether or not he "failed" an exam or was academically "disqualified" is highly sensitive information that is not public, but was brandished in articles published by DAILY MAIL, without Plaintiff's authorization, whatsoever. Accordingly, Plaintiff has a legally protected interest in information about his academic performance and educational background.

111. Defendants have and continue to commit serious invasions of Plaintiff's privacy, by obtaining and disclosing his private academic and educational records to the public, and making such information available to any third party who may come across Defendants' news articles and/or search Plaintiff's name on the Internet.

112. There are no competing or countervailing interests that outweigh the privacy interests at stake. Accordingly, Plaintiff seeks declaratory and injunctive relief to prevent Defendants from continuing to obtain, use, disclose and/or disseminate Plaintiff's academic and educational records.

# FIFTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACTS

### (Against DAILY MAIL)

113.   Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

114.   Plaintiff had valid written retainer agreements with numerous clients, including high profile clients such at Met Assistant Commissioner Tarique Ghaffur, Met Commander Ali Dizaei, and the National Black Police Association.

115.   Plaintiff is informed and believes, and based thereon alleges, that Defendants had knowledge of these attorney-client contractual relationships with third parties, or should reasonably have had knowledge of or been aware of the contractual nature of Plaintiff's client relationships.  On information and belief, Defendants take credit for interrupting Plaintiff's representation of at least two (2) clients who brought race discrimination claims against Scotland Yard.

116.   As a result of Defendants' ongoing tortious scheme to obtain and disclose Plaintiff's private academic and educational records in an attempt to discredit and disrepute Plaintiff's professional qualifications, work ethic and integrity, Plaintiff's contractual relationships with numerous clients were terminated.

117.   As a direct and proximate result of Defendants' intentional interference with Plaintiff's attorney-client relationships, Plaintiff has been injured in an amount of damages to be determined according to proof at trial, but which exceeds the jurisdictional requirements of this Court.

///

///

///

///

# SIXTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against DAILY MAIL)

118.   Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

119.   At all times relevant to this Complaint, Plaintiff has had prospective economic relationships with a number of third-parties who, but for the foregoing acts by Defendants, would have entered into, or expanded, a client relationship with Plaintiff involving his retention for the provision of legal services and representation.  Each such relationship offered the probability of future economic benefit to Plaintiff.  On information and belief, Defendants were aware that Plaintiff had (and still has) such existing and prospective economic relationships.

120.   In particular, Defendants have violated Plaintiff's privacy rights in order to cast doubt upon his educational background and professional credentials, and have thereby interfered with Plaintiff's ability to practice law in the UK.  Prior to Defendants' unauthorized possession, use, publication and dissemination of Plaintiff's academic and educational records, Plaintiff owned and maintained a thriving law firm in London, England, and so, if not for Defendants' interference, Plaintiff would have continued to operate his legal practice.  In fact, in various news articles that Defendants published, Defendants take credit for shutting down Plaintiff's law firm, as well as for the SRA's suspension of Plaintiff's license.

121.   As a direct result of Defendants' interference, Plaintiff lost two important economic benefits: (a) his existing law firm and clients, and (b) the opportunity to represent prospective clients with their legal disputes.

122.   Upon information and belief, Defendants knowingly, intentionally, and with malice committed the wrongful acts alleged above with the intent to interfere

1   with and disrupt the prospective economic relationship between Plaintiff and his
2   existing and future customers, and/or with the knowledge that as a direct result of
3   the foregoing acts, interference with Plaintiff's business was certain or substantially
4   certain to occur.  Defendants' foregoing acts were not privileged.

5       123.   By reason of the foregoing acts, the prospective economic relationship
6   between Plaintiff and its existing and future customers was actually disrupted.
7   Defendants' acts constitute intentional interference with prospective economic
8   advantage under the laws of the State of California.

9       124.   As a direct and proximate result of Defendants' conduct, Plaintiff has
10  suffered, is suffering and will continue to suffer financial and other damage in an
11  amount to be proven at trial.

12      125.   Defendants' acts will continue and will cause irreparable injury to
13  Plaintiff unless enjoined by this Court.

14                        **SEVENTH CAUSE OF ACTION**
15                **THE COMPUTER FRAUD AND ABUSE ACT**
16            **(VIOLATIONS OF 18 U.S.C. § 1030 ("CFAA"))**
17                        **(Against All Defendants)**

18      126.   Plaintiff repeats, realleges, adopts and incorporates each and every
19  allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth
20  herein.

21      127.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, referred to as
22  "CFAA," regulates fraud and related activity in connection with computers, and
23  makes it unlawful to intentionally access a computer used for interstate commerce
24  or communication, without authorization or by exceeding authorized access to such
25  a computer, thereby obtaining information from such a protected computer, within
26  the meaning of U.S.C. § 1030(a)(2)(C).

27      128.   DAILY MAIL and the STUDENT CLEARINGHOUSE violated 18
28  U.S.C. § 1030 by intentionally accessing Plaintiff's educational records without

authorization or by exceeding authorization, thereby obtaining information from such a protected computer.

129.    The CFAA, 18 U.S.C. § 1030(a)(5)(A)(i) makes it unlawful to "knowingly cause the transmission of a program, information, code, or command and as a result of such conduct, intentionally cause damage without authorization, to a protected computer," of a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

130.    The Defendants violated the CFAA in that the Defendants caused the transmission to DAILY MAIL of Plaintiff's educational records that caused economic loss to plaintiff in excess of $5,000 value.

131.    Specifically, DAILY MAIL knowingly and intentionally made one or more requests to STUDENT CLEARINGHOUSE to retrieve Plaintiff's educational records, without his consent. STUDENT CLEARINGHOUSE knowingly and intentionally failed to require proper verification of consent before divulging Plaintiff's educational records to the DAILY MAIL.

132.    DAILY MAIL and STUDENT CLEARINGHOUSE intended to cause damage to Plaintiff in that they knew or should have known that the activities described herein would result in confidential disclosures of Plaintiff's educational records without his consent.

133.    DAILY MAIL and STUDENT CLEARINGHOUSE acted without authorization and/or exceeding authorization in that they have continued to store Plaintiff's educational records, without his consent. Moreover, the DAILY MAIL has continued to publicize Plaintiff's educational records on its Websites, among other places, without his consent starting in September 2008 and continuing to the present.

134.    DAILY MAIL violated 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission  of a command to STUDENT CLEARINGHOUSE's computers that contain Plaintiff's confidential educational records, which are

1   protected computers as defined above, and intentionally causing damage without
2   authorization.

3       135.   DAILY MAIL violated 18 U.S.C. § 1030(a)(5)(A)(ii) by intentionally
4   accessing Plaintiffs' protected educational records without authorization, and as a
5   result of such conduct, recklessly caused (and continues to cause) damage to
6   Plaintiff by impairing the confidentiality and integrity of his educational data
7   maintained by Defendants on their systems, without authorization to publicize
8   articles like those attached in Exhibits "1"-"48," (among others) on DAILY
9   MAIL's Websites.

10      136.   Together, the DAILY MAIL and STUDENT CLEARINGHOUSE
11  violated 18 U.S.C. § 1030 (a)(5)(A)(iii) by intentionally accessing Plaintiff's
12  protected records located on National computers without authorization, and as a
13  result of such conduct, causing damage and loss to Plaintiff.  As alleged in
14  paragraphs 1-135 above, Plaintiff suffered damage by reason of these violations, as
15  defined in 18 U.S.C. 1030(e)(8), by the "impairment to the integrity or availability
16  of data, a program, a system or information."

17      137.   As alleged in paragraphs 1-136 above, Plaintiffs have also suffered
18  loss by reason of these violations, as defined in 18 U.S.C. 1030(e)(11), by the
19  "reasonable cost . . . including the cost of responding to an offense, conducting a
20  damage assessment, and restoring the data, program, system, or information to its
21  condition prior to the offense, and any revenue lost, cost incurred, or other
22  consequential damages incurred because of interruption of service."

23      138.   Defendants' unlawful access to Plaintiff's computers, use of his
24  confidential educational records, interruption of STUDENT CLEARINGHOUSE's
25  obligation to maintain student confidentiality in its services, and taking of
26  Plaintiff's confidential educational information resulted in an aggregated loss to
27  Plaintiff of at least $5,000 within a one-year period.

28      139.   The aggregated losses to Plaintiff amount to over $5,000 or

greater during a one-year period in that his personal educational records are valuable and he has lost clients and the ability to practice law in London as result of Defendants' violations.

## EIGHTH CAUSE OF ACTION

### CALIFORNIA'S COMPUTER CRIME LAW ("CCCL")

### (VIOLATION OF CALIFORNIA PENAL CODE § 502)

### (Against All Defendants)

140.   Plaintiff repeats, realleges, adopts and incorporates each and every allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth herein.

141.   The California Computer Crime Law, California Penal Code § 502, referred to as "CCCL" regulates "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

142.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE have violated California Penal Code § 502 by knowingly accessing, copying, using, made use of, interfering, and/or altering, data belonging to Plaintiff: (1) in and from the State of California; (2) in the home country of the Plaintiff; and (3) in the state in which the servers that provided the communication link between DAILY MAIL and the STUDENT CLEARINGHOUSE website DAILY MAIL interacted with to extract Plaintiff's confidential educational records.

143.   Pursuant to California Penal Code § 502(b)(1), "Access means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."

144.   Pursuant to California Penal Code § 502(b)(6), "Data means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."

145.   Pursuant to California Penal Code § 502(b)(8), "Injury means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program."

146.   Pursuant to California Penal Code § 502(b)(10), a "Computer contaminant means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network."

147.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE have violated California Penal Code § 502(c)(1) by knowingly accessing and without permission, making use of data from Plaintiff's educational records on the STUDENT CLEARINGHOUSE's computers in order to devise and execute business practices to deceive Plaintiff and other students into surrendering private electronic educational records that were supposed to have been kept confidential, as promised by the STUDENT CLEARINGHOUSE's website, but in fact were not.

148.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE have violated California Penal Code § 502(c)(2) by knowingly accessing and without permission, taking, or making use of Plaintiff's stored data on the STUDENT CLEARINGHOUSE's computers.  Plaintiff is informed and believes that his educational records were provided to STUDENT CLEARINGHOUSE in trust – with the express understanding that Plaintiff's records were (a) confidential and (b) would not be divulged to anyone without his consent.

149.   Defendant has violated California Penal Code § 502(c)(3) by knowingly and without permission, using and causing to be used STUDENT CLEARINGHOUSE's computer services to wrongfully access, transmit, store and publicize Plaintiffs' educational data.

150.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE have violated California Penal Code § 502(c)(4) by knowingly accessing and without permission, transferring the data from the STUDENT CLEARINGHOUSE's computers containing Plaintiff's private educational records and confidential data to the DAILY MAIL.

151.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE have violated California Penal Code § 502(c)(5) by knowingly and without permission, compromising the integrity and confidentiality of Plaintiff's educational records stored (in trust) on STUDENT CLEARINGHOUSE's servers.

152.   Defendants have violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiff's private records submitted to the STUDENT CLEARINGHOUSE in trust for storage on its computers, computer system, and/or computer network.

153.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' information through computers, computer system, and/or computer network.

154.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE violated California Penal Code § 502(c)(8) by knowingly accessing Plaintiff's educational records without consent.

155.   California Penal Code § 502(j) states: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction

1  from another jurisdiction is deemed to have personally accessed the computer,

2  computer system, or computer network in each jurisdiction."

3      156.   Plaintiff has also suffered irreparable injury from these

4  unauthorized acts of disclosure, to wit: his personal, private, and sensitive

5  educational records and electronic communications have been harvested, viewed,

6  accessed, stored, and used by Defendants DAILY MAIL and STUDENT

7  CLEARINGHOUSE, and have not been destroyed, and due to the continuing threat

8  of such injury, Plaintiff has no adequate remedy at law, entitling Plaintiff to

9  injunctive relief.

10      157.   Plaintiff has additionally suffered loss by reason of these violations,

11  including, without limitation, violation of the right of privacy.

12      158.   As a direct and proximate result of Defendants' unlawful conduct

13  within the meaning of California Penal Code § 502, Defendants have caused loss to

14  Plaintiff in an amount to be proven at trial. Plaintiff is also entitled to recover his

15  reasonable attorneys' fees pursuant to California Penal Code § 502(e).

16      159.   Plaintiff also seeks compensatory damages, in an amount to be proven

17  at trial, and injunctive or other equitable relief.

18      160.   Plaintiff has suffered irreparable and incalculable harm and injuries

19  from Defendants' violations. The harm will continue unless Defendants are

20  enjoined from further violations of this section.

21      161.   Plaintiff has no adequate remedy at law.

22      162.   Plaintiff is entitled to punitive or exemplary damages pursuant to Cal.

23  Penal Code § 502(e)(4) because Defendants' violations were willful and, on

24  information and belief, Defendants DAILY MAIL and STUDENT

25  CLEARINGHOUSE are guilty of oppression, fraud, or malice as defined in Cal.

26  Civil Code § 3294.

27      163.   Defendants DAILY MAIL and STUDENT CLEARINGHOUSE's

28  unlawful access to Plaintiff's educational records and other private information

1   stored in trust on STUDENT CLEARINGHOUSE's computers, computer systems

2   or servers, and unauthorized electronic communications relating thereto, have

3   caused Plaintiffs irreparable injury.  Unless restrained and enjoined, Defendants

4   will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to

5   compensate it for these inflicted and threatened injuries, entitling Plaintiffs to

6   remedies including injunctive relief as provided by California Penal Code § 502(e).

### NINTH CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT

### (VIOLATION OF CALIFORNIA PENAL CODE § 630 *et seq.*)

### (Against All Defendants)

11  164.    Plaintiff repeats, realleges, adopts and incorporates each and every

12  allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth

13  herein.

14  165.   California Penal Code section 630 provides, in part:

> Any person who, . . . or who willfully and without the consent of
> all parties to the communication, or in any unauthorized manner,
> reads, or attempts to read, or to learn the contents or meaning of
> any message, report, or communication while the same is in transit
> or passing over any wire, line, or cable, or is being sent from, or
> received at any place within this state; or who uses, or attempts to
> use, in any manner, or for any purpose, or to communicate in any
> way, any information so obtained, or who aids, agrees with,
> employs, or conspires with any person or persons to unlawfully do,
> or permit, or cause to be done any of the acts or things mentioned
> above in this section, is punishable . . .

23  166.   On information and belief, Plaintiff alleges that the Universities and

24  colleges located in California where plaintiff pursued his studies transmitted

25  Plaintiff's educational records to STUDENT CLEARINGHOUSE, in trust, so that

26  they could be maintained by protecting Plaintiff's privacy.  The unauthorized

27  transmittal of Plaintiff's confidential educational records to the DAILY MAIL, and

28  Defendants' collusion with the SRA or others to publicize his confidential

educational records in unauthorized articles published on the DAILY MAIL
Websites constitutes unauthorized interceptions of private electronic
communications prohibited by the California Penal Code.

167.   Defendants' unauthorized communications with the institutions where
Plaintiff studied in California to obtain his educational records– either directly or
via STUDENT CLEARINGHOUSE – constitute unauthorized communications to
and from California in violation of the California Penal Code § 630.

168.   Plaintiff did not consent to any of the Defendants' actions in
unlawfully intercepting, reading, and/or learning the contents of his educational
records maintained with the institutions where he studied and/or the STUDENT
CLEARINGHOUSE.  Defendants wrongfully obtained and disclosed Plaintiff's
confidential educational records to the DAILY MAIL, without Plaintiff's consent.

169.   Plaintiff did not consent to any of the Defendants' actions in using the
contents of their communications with the California-based entities where he
studied to publicize his confidential academic records.

170.   None of the Defendants are a "public utility engaged in the business of
providing communications services and facilities . . ."

171.   The actions alleged herein by the Defendants were not undertaken:
"for the purpose of construction, maintenance, conduct or operation of the services
and facilities of the public utility."

172.   The actions alleged herein by the Defendants were not undertaken in
connection with: "the use of any instrument, equipment, facility, or service
furnished and used pursuant to the tariffs of a public utility."

173.   The actions alleged herein by the Defendants were not undertaken with
respect to any telephonic communication system used for communication
exclusively within a state, county, city and county, or city correctional facility.

174.   The Defendants directly participated in the interception, reading,
transmittal, use, learning and/or exposure of the contents of Plaintiff's educational

1  records maintained by the California-based universities and other institutions (such
2  as the STUDENT CLEARINGHOUSE).   Plaintiff is informed and believes that his
3  educational records are stored by the Universities he attended and the STUDENT
4  CLEARINGHOUSE vendor in trust, with the strict understanding that they should
5  remain confidential and not be disclosed to anyone without Plaintiff's consent.
6  Plaintiff never consented to the use of his educational records by the DAILY MAIL
7  – much less four years of repeated publications that remain fixed on the Internet via
8  the DAILY MAIL's Websites, and proliferated to others around the world.

9      175.   Plaintiff has additionally suffered loss by reason of these violations,
10  including, without limitation, violation of the right of privacy.
11  Unless restrained and enjoined, Defendants will continue to commit such acts.
12  Pursuant to Section 637.2 of the California Penal Code, Plaintiff has been injured
13  by the violations of California Penal Code § 630 *et seq*. Wherefore, Plaintiff seeks
14  damages and injunctive relief.

15                    **TENTH CAUSE OF ACTION**
16                     **DECLARATORY RELIEF**
17                    **(Against All Defendants)**

18      176.   Plaintiff repeats, realleges, adopts and incorporates each and every
19  allegation contained in Paragraphs 1 though 84, inclusive, as though fully set forth
20  herein.

21      177.   There exists a genuine and bona fide dispute, and an actual
22  controversy and disagreement between Plaintiff and Defendants concerning
23  whether Plaintiff's academic and educational records are private and confidential
24  and, therefore, unlawfully obtained, disclosed and disseminated.

25      178.   Plaintiff's academic and educational records are private and
26  confidential.  Defendants' possession, disclosure, use, publication and
27  dissemination of such records is/was unauthorized, and constitutes an infringement
28  of Plaintiff's rights and a violation of applicable federal laws and California state

1    privacy rights and laws.

2        179.   Plaintiff lacks an adequate remedy at law.  Plaintiff has suffered

3    irreparable harm through the loss of his law practice and damage to his professional

4    reputation, and will continue to be irreparably injured unless the Court declares that

5    Plaintiff's academic and educational records are private, that Defendants accessed

6    same without his consent and that Defendants' conduct is wrongful.

7        180.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201

8    through 2202, Plaintiff in good faith requests that the Court declare the following:

9    (a) Plaintiff's academic and educational records are private and confidential; (b)

10   Defendants' possession, disclosure, use, publication and dissemination of Plaintiff's

11   academic and educational records is unauthorized; and (c) Defendants' possession,

12   disclosure, use, publication and dissemination of Plaintiff's academic and

13   educational records constitutes an infringement of Plaintiff's privacy rights under

14   California state privacy rights and laws, applicable federal privacy laws and a

15   violation of STUDENT CLEARINGHOUSE's published Privacy Commitment and

16   website Terms & Conditions of Use.

17                          **PRAYER FOR RELIEF**

18       WHEREFORE, Plaintiff respectfully requests that the Court enter judgment

19   and order in his favor and against Defendants, and each of them, as follows:

20       1.   That the court declare that: (a) Plaintiff's academic and educational

21   records are private and confidential; (b) Defendants' possession, disclosure, use,

22   publication and dissemination of Plaintiff's academic and educational records is

23   unauthorized; and (c) Defendants' possession, disclosure, use, publication and

24   dissemination of Plaintiff's academic and educational records constitutes an

25   infringement of Plaintiff's privacy rights under California state privacy rights and

26   laws, applicable federal law and a violation of STUDENT CLEARINGHOUSE's

27   privacy policy and terms of use;

28       2.   That the Court enjoin Defendants from obtaining, disclosing, using,

1   publishing and disseminating Plaintiff's academic and educational records

2   pursuant to Bus. & Prof. Code §§17203, 17535;

3       3.   For an award of restitution pursuant to Bus. & Prof. Code §§17203,

4   17535;

5       4.   That the Court award pre-judgment and post-judgment interest at the

6   highest rates allowable by law;

7       5.   That the Court award actual damages in an amount to be determined

8   according to proof at trial;

9       6.   That the Court award the reasonable attorneys fees and costs incurred

10  by Plaintiff in bringing this suit; and

11      7.   That the Court award such other, further, or different relief that is

12  may find just, proper and equitable under the circumstances.

13

14  DATED: April 4, 2012                    EDWARDS WILDMAN PALMER LLP

15

16                                          *Dominique Shelton*

17                              By   _____

18                                          Dominique R. Shelton
                                            Erin L. Pfaff
19                                          Attorneys for Plaintiff,
                                            Shahrokh Mireskandari

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands trial by jury pursuant to the Federal Rules of Civil

3

Procedure, Rule 38(b) (28 U.S.C. § 38).

4

5

DATED: April 4, 2012                    EDWARDS WILDMAN PALMER LLP

6

7

By _____

8

Dominique R. Shelton

9

Erin L. Pfaff
Attorneys for Plaintiff,

10

Shahrokh Mireskandari

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28